COMMUNITY COLLABORATIVE OF BRIDGEPORT,
INC. *v.* JOSEPH P. GANIM ET AL.
(SC 15590)

Callahan, C. J., and Berdon, Katz, Palmer and McDonald, Js.

Argued March 21—officially released July 8, 1997

*Lori Welch-Rubin*, for the appellant (plaintiff).

*Arthur C. Laske III*, assistant city attorney, for the appellees (defendants).

*Opinion*

KATZ, J. This appeal arises from an action seeking injunctive and declaratory relief brought by Alma Maya, as cochairperson of and in the name of the plaintiff, Community Collaborative of Bridgeport, Inc. (CCB), against the defendants, Joseph P. Ganim, mayor of the city of Bridgeport, and the city council of the city of Bridgeport (council). The trial court, *Moran, J.*, granted the defendants' motion to dismiss, concluding that Maya did not have the authority unilaterally to file the action against the defendants. We conclude that Maya lacked standing to bring this action and, therefore, we affirm the judgment of the trial court.

The following undisputed facts are relevant to this appeal. In order to apply for a grant from the federal Department of Housing and Urban Development (department) under the "Empowerment Zone/Enterprise Community" program, the council established an organization known as the Interim Community Collaborative of Bridgeport (interim CCB). The interim CCB consisted of approximately thirty representatives of various community service and business organizations, the mayor's office and the council. Maya, Mary McDuffie and Joshua Nessen acted as its cochairpersons. The

interim CCB, together with the council, developed a strategic plan (plan) that they submitted to the department as part of the application process. In December, 1994, the department declared that the city of Bridgeport had been approved as an enterprise community and was eligible for a grant of $2.95 million.

In January, 1995, the interim CCB was incorporated as the CCB, a nonprofit corporation, as the official organization established for the administration of the grant funds. As authorized by the CCB's bylaws, Maya, McDuffie and Nessen, as the incorporators of the CCB, consented to their appointment as the CCB's initial officers.[1] Maya, McDuffie and Nessen were named president, vice president and secretary, respectively. The bylaws provided that succeeding officers would be elected at the first annual meeting of the CCB, which would take place no later than December 31, 1995.[2] The first annual meeting never in fact occurred and, therefore, the election of succeeding officers never took place. The CCB bylaws also provided that "[t]he president shall be the principal executive officer of the [CCB] and, subject to the control of the Board of Directors, shall in general supervise and control all of the business and affairs of the [CCB] and the Board of Directors."[3]

[1] Article seven, § 1, of the CCB bylaws provides: "Initial Board Officers. Upon incorporation, the initial Officers of the Corporation shall be as follows. Officers will consist of the [interim CCB] chairpersons of the interim CCB, one of whom shall function as President, one of whom shall function as Vice-President, and one of whom shall function as Treasurer, as well as the current Secretary of the interim CCB."

[2] Article seven, § 2, of the CCB bylaws provides: "Election of Subsequent Officer. At the annual meeting of the CCB to be held after August 1, 1995 and no later than December 31, 1995, the following new officers will be elected by simple majority vote of the CCB Board of Directors: President, First Vice-President, Second Vice-President, Treasurer and Secretary. Additional officers may be elected as the CCB Board deems necessary. Nominations for officers may be made from the floor and individuals representing duly recognized CCB member organizations may self-nominate if they so choose."

[3] Article seven, § 6, of the CCB bylaws provides: "Duties of the President. The president shall be the principal executive officer of the Association and,

Subsequently, the CCB proposed a budget for the use of the grant funds, of which $1.3 million was allocated for administrative expenses. The department, the state of Connecticut and the city of Bridgeport all objected to the proposed budget, and the CCB thereafter reduced the budgeted administrative expenses to $560,000. The department, the state and the city continued to object to the amended budget, and the department declined to forward the funds until the CCB adopted a satisfactory budget.

On January 23, 1996, in response to the defendants' objections to the amended budget, the board of directors of the CCB (board) passed the following authorization: "The [board] gives authority to the CCB chairpersons to investigate and if necessary initiate legal action, including retention of legal counsel, on behalf of the [b]oard to prevent a City of Bridgeport takeover of the federal Enterprise Community funds and process." At the time that the authorization was passed, Maya and McDuffie were the cochairpersons of the CCB. See footnote 4 of this opinion. On February 5, 1996, the council passed a resolution to amend the plan, which purported to alter the composition of the board and diminish its role in formulating the CCB's budget. Subsequently, Maya, as cochairperson of the board, unilaterally filed an action in the trial court. She sought declaratory relief, alleging that the council's

subject to the control of the Board of Directors, shall in general supervise and control all of the business and affairs of the Association and the Board of Directors. He or she may sign, with the secretary of any other proper officer of the Association there unto authorized by the Board of Directors, any deeds, mortgages, bonds, contracts or other instruments which the Board of Directors has authorized to be executed, except in cases where the signing and execution thereof shall be expressly delegated by the Board of Directors or by these Bylaws to some other officer or agent of the Association, or shall be required by law to be otherwise signed or executed; and in general shall perform all duties incident to the office of president and such other duties as may be prescribed by the Board of Directors from time to time."

resolution was "illegal and without force and effect at law," and for injunctive relief "requiring the defendants to declare illegal their actions in amending the membership, purpose and structure of the [CCB] by an invalid resolution and to refrain from any and all attempts to effectuate such resolution." The defendants filed a motion to dismiss, arguing that Maya did not have the authority to file the action unilaterally and, furthermore, that the CCB board did not ratify her actions.

During a seven day hearing before the trial court, the parties presented testimony and evidence with respect to Maya's authority to file the present action. Although Maya claimed in the verified complaint that she was authorized to file suit as a "duly authorized representative of the [CCB], as its cochairperson," her authority was challenged by McDuffie, the other cochairperson.[4] In a sworn affidavit, McDuffie stated that "[a]t no time have I, as cochair of the CCB, authorized that suit be instituted with regard to the actions of the city council or mayor, and I am aware of no authority conferred upon Alma Maya to authorize the institution of suit on behalf of the CCB."

The trial court granted the motion to dismiss, concluding that a clear reading of the CCB's January 23, 1996 authorization required all of the chairpersons to act jointly with respect to any decision to bring an action and, therefore, Maya's unilateral action was not authorized by the board. Furthermore, in its oral memorandum of decision, the trial court made the factual finding that "the court is not convinced whether there was ample evidence to indicate that an emergency, urgent, or critical situation existed which would have

[4] On September 26, 1995, approximately five months prior to the initiation of this action, Karen Daden, another cochairperson, had tendered her resignation as cochairperson "[e]ffective immediately." Accordingly, for the purposes of this appeal, the only relevant cochairpersons are Maya and McDuffie.

permitted the chairperson and/or the president, however you want to call that person to act independently; nor was there a deadlock situation." Maya appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

On appeal, Maya argues that the trial court improperly concluded that she lacked standing to bring an action on behalf of the CCB because: (1) as president of the corporation, she had the inherent authority to initiate this action to preserve the corporate interest; (2) she also had the authority to bring this action to preserve the corporate interest because the two officers expressly authorized to bring suit were deadlocked in opposition to each other; and (3) the members of the CCB acquiesced in the filing of the action at a subsequent meeting, and thus ratified the action. We disagree with each of these claims.[5]

---

[5] On December 3, 1996, the defendants filed a motion to dismiss this appeal as moot because, on June 3, 1996, the council passed a resolution "thereby amending the Enterprise Community Strategic Plan Governance Structure so as to delete the [CCB] and create the Bridgeport Enterprise Community Partnership." Subsequent to the council's resolution, Wilfredo Matos, Nirma Reyes and Thelma Perkins, CCB board members, filed an action in federal District Court against the department, requesting a declaratory judgment that the CCB "is the permanent governance structure for implementing the plan."

This court denied the defendants' motion without prejudice to renewal at oral argument. Additionally, this court ordered supplemental briefing to include consideration of: "(1) the incorporated status of the CCB, including any effect that the June 3, 1996 resolution may have on this status; and (2) the status of the pending federal court action . . . regarding the validity of the June 3, 1996 resolution."

Specifically, the defendants argue in their motion to dismiss that, as a result of the June 3, 1996 resolution, the issues raised by Maya are now moot because the CCB no longer has any involvement in the plan. We disagree.

"Mootness implicates the court's subject matter jurisdiction and is thus a threshold matter for us to resolve. . . . It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot ques-

I

We begin by recognizing the well settled principles with respect to a trial court's power to determine its own jurisdiction. "As we have held repeatedly, the power to determine its jurisdiction is one of the core inherent powers of a court. [O]nce the question of lack of jurisdiction of a court is raised, [it] must be disposed of no matter in what form it is presented . . . and the court must fully resolve it before proceeding further with the case. . . . [A] court must have jurisdiction to determine its own jurisdiction once that has been put in issue. . . . *Castro* v. *Viera*, 207 Conn. 420, 429–30, 541 A.2d 1216 (1988); accord *Chrysler Credit Corp.* v. *Fairfield Chrysler-Plymouth, Inc.*, 180 Conn. 223, 227, 429 A.2d 478 (1980); *Aaron* v. *Conservation Commission*, 178 Conn. 173, 178, 422 A.2d 290 (1979).

"As we also have held, [i]t is a basic principle of law that a plaintiff must have standing for the court to have jurisdiction. Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the

tions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . An actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Citations omitted; internal quotation marks omitted.) *Ayala* v. *Smith*, 236 Conn. 89, 93–94, 671 A.2d 345 (1996).

What is determined in the federal court action regarding the June 3, 1996 resolution will necessarily implicate the validity of the February 5, 1996 resolution, which is the subject of this appeal. The District Court may hold that the June 3, 1996 resolution is valid, concluding that the council properly altered the role of the CCB in the implementation of the plan, and thereby render moot the issue of the February 5, 1996 resolution. In the event, however, that the District Court concludes that the June 3, 1996 resolution was invalid, the propriety of the February 5, 1996 resolution would still be in controversy. Therefore, we conclude that because there remains the possibility that the June 3, 1996 resolution was invalid, Maya's claims are not rendered moot as a result of that resolution. Accordingly, we address her standing claims.

jurisdiction of the court unless he has . . . some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . *Unisys Corp.* v. *Dept. of Labor*, 220 Conn. 689, 693, 600 A.2d 1019 (1991); *Ardmare Construction Co.* v. *Freedman*, 191 Conn. 497, 501, 467 A.2d 674 (1983). The standing requirement is designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . *Rose* v. *Freedom of Information Commission*, 221 Conn. 217, 223, 602 A.2d 1019 (1992); *Board of Pardons* v. *Freedom of Information Commission*, 210 Conn. 646, 649, 556 A.2d 1020 (1989); *Maloney* v. *Pac*, 183 Conn. 313, 320, 439 A.2d 349 (1981).

"To fulfill these goals, the standing doctrine requires a plaintiff to demonstrate two facts. First, the complaining party must be a proper party to request adjudication of the issues. *Nye* v. *Marcus*, 198 Conn. 138, 141, 502 A.2d 869 (1985). Second, the person or persons who prosecute the claim on behalf of the complaining party must have authority to represent the party. See, e.g., *Orsi* v. *Senatore*, 230 Conn. 459, 470, 645 A.2d 986 (1994) (standing of foster parent to sue child's guardian on behalf of child); *State* v. *Nardini*, 187 Conn. 109, 112–16, 445 A.2d 304 (1982) (standing of state's attorney to challenge recommendation of sentence review division on behalf of state); *Barrett* v. *Southern Connecticut Gas Co.*, 172 Conn. 362, 370, 374 A.2d 1051 (1977) (standing of shareholder to file derivative action on behalf of corporation); *Vaitekunene* v. *Budrys*, 156 Conn. 547, 554, 244 A.2d 408 (1968) (standing of legatee's purported attorney to appeal order of Probate Court on behalf of legatee).

"A complaining party ordinarily can show that it is a proper party when it makes a colorable claim of [a]

direct injury [it] has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy. . . . *Rose* v. *Freedom of Information Commission*, supra, 221 Conn. 223–24; *Board of Pardons* v. *Freedom of Information Commission*, supra, 210 Conn. 649; *Maloney* v. *Pac*, supra, 183 Conn. 321.

"To demonstrate authority to sue, however, it is not enough for a party merely to show a colorable claim to such authority. Rather, the party whose authority is challenged has the burden of convincing the court that the authority exists. See *Orsi* v. *Senatore*, supra, 230 Conn. 470; *Vaitekunene* v. *Budrys*, supra, 156 Conn. 554; see also *Meredith* v. *Ionian Trader*, 279 F.2d 471, 474 (2d Cir. 1960) (A party to . . . a suit may by motion or pleading dispute the authority of the opposing party to act for the party in whose name he is proceeding, and, if the authority is not shown, the court will dismiss the action for want of parties before it.). The burden of proof for questions of authority is higher than that for questions of propriety because the former questions are more important. Lawsuits must be authorized not only to ensure that the litigants fairly and vigorously represent the party's views; *Rose* v. *Freedom of Information Commission*, supra, 221 Conn. 223; but also because, if unauthorized lawsuits were allowed to proceed, future rights of the named parties might be severely impaired. Because of the doctrines of collateral estoppel (issue preclusion) and res judicata (claim preclusion), parties named in an unauthorized suit might later be unable to relitigate issues decided in that suit or to bring new claims. *Barrett* v. *Southern Connecticut Gas Co.*, supra, 172 Conn. 371." (Internal quotation marks omitted.) *Golden Hill Paugussett Tribe of Indians* v. *Southbury*, 231 Conn. 563, 570–573, 651 A.2d 1246 (1995). Because it is undisputed that the CCB is

the proper party to request adjudication of this matter, our inquiry focuses only on whether Maya had the authority to prosecute this claim on behalf of the CCB.

## II

## A

Maya first argues that, as the president of the CCB, she had the inherent authority to initiate this action to preserve the corporate interest.[6] Even if we were to

---

[6] It is undisputed that Maya was appointed as the initial president of the CCB in January, 1995. Furthermore, the CCB bylaws provided that succeeding officers would be elected at the first annual meeting, which would take place no later than December 31, 1995. The first annual meeting, however, never occurred and, therefore, the election of succeeding officers never took place. Accordingly, after December 31, 1995, Maya was no longer the de jure president of the CCB. *Welch* v. *Seymour*, 28 Conn. 387, 392 (1859).

At oral argument, the issue was raised with respect to whether Maya, as a de facto officer of the CCB, had the authority to file this action. Although this court has articulated the de facto doctrine in the context of public officers; see, e.g., *Sansone* v. *Clifford*, 219 Conn. 217, 227, 592 A.2d 931 (1991); we have never discussed the parameters of the doctrine with respect to private corporations. Other jurisdictions have held that a de facto officer or director of a private corporation is one in possession of and exercising the powers of the office under the claim and color of an election or appointment, although he or she is not a de jure officer. *Prickett* v. *American Steel & Pump Corp.*, 253 A.2d 86, 88 (Del. 1969); *Forest Home Cemetery Assn.* v. *Dardanella Financial Corp.*, 329 N.W.2d 885, 888 (S.D. 1983); see also 18B Am. Jur. 2d 308–309, Corporations § 1414 (1985). A de facto officer is one whose acts, though not those of a lawful officer, are such that the law will hold them valid, upon principles of policy and justice, insofar as they involve the interest of the public and third persons. *Jack* v. *Oakbrook Terrace Community Park District*, 31 Ill. 2d 390, 392, 202 N.E.2d 7 (1964); *Smith* v. *Bayou Rentals, Inc.*, 345 So. 2d 1229, 1231 (La. App. 1977). Thus, a person held out by the corporation as its officer may become a de facto officer, provided that he or she holds office under some degree of notoriety or color of title. *Beraksa* v. *Stardust Records, Inc.*, 215 Cal. App. 2d 708, 714–15, 30 Cal. Rptr. 504 (1963). Furthermore, the mere assumption of title to office on one occasion cannot clothe a person with the title of a de facto officer; instead, there must be a continuing exercise of the functions of the office. *Deal* v. *Johnson*, 362 So. 2d 214, 219 (Ala. 1978); *Wolff* v. *Arctic Bowl, Inc.*, 560 P.2d 758, 764 n.7 (Alaska 1977). Without deciding whether the trial court properly found that Maya acted as the de facto president of the CCB, we conclude, based on the reasons set forth below, that Maya did not have the authority to initiate this action.

agree that Maya was the duly authorized president of the CCB, we disagree that her position thereby provided her with the inherent authority to file this action.

It is well settled in Connecticut law that "[c]orporate presidency per se does not confer inherent authority to commit the corporation. The corporation is only liable for the acts of its president if it is shown that [her] acts are so related to [her] duties as president that they may reasonably be held to have been done in the prosecution of the business of the corporation and while [she] was acting within the scope of [her] employment. *Baptist* v. *Shanen*, 145 Conn. 605, 608–609, 145 A.2d 592 (1958); *Cohen* v. *Holloways', Inc.*, 158 Conn. 395, 406–407, 260 A.2d 573 (1969); *Perry* v. *Simpson Waterproof Mfg. Co.*, 37 Conn. 520, 534 (1871). The liability of the corporation therefore depends upon whatever specific powers of agency have been conferred upon the president. See Kempin, 'The Corporate Officer and the Law of Agency,' 44 Va. L. Rev. 1273 (1958)." *Lettieri* v. *American Savings Bank*, 182 Conn. 1, 7–8, 437 A.2d 822 (1980); see also S. Cross, Connecticut Corporation Law and Practice (1989) § 5.6, p. 256 n.75. Maya relies principally on *Zaubler* v. *West View Hills, Inc.*, 148 Conn. 540, 172 A.2d 604 (1961), in arguing that, as president of the CCB, she had the authority to initiate this action to preserve the corporate interest. We disagree that *Zaubler* provides precedent for concluding that her unilateral action was valid.

In *Zaubler*, the plaintiff, as president of the corporation, sought to enjoin the defendant directors and shareholders from withdrawing an action that the plaintiff had brought in New York to prevent the defendants' diversion of corporate assets. Id., 542–43. This court noted, in dicta, the holding of the New York Court of Appeals in *West View Hills, Inc.* v. *Lizau Realty Corp.*, 6 N.Y.2d 344, 160 N.E.2d 622, 189 N.Y.S.2d 863 (1959), which stated that the plaintiff, as president of the corpo-

ration, had the authority "to institute such an action where there was no contrary provision in the bylaws and no prohibitory action by the board of directors." *Zaubler* v. *West View Hills, Inc.*, supra, 148 Conn. 543.

Even if we were to find this dicta persuasive, we conclude that, in light of the board's January 23, 1996 authorization as informed by the relevant provision in the bylaws governing the president's authority, Maya did not have the authority to initiate this action. The bylaws of the CCB specifically provided that "[t]he president shall be the principal executive officer of the [CCB] and, *subject to the control of the [board]*, shall in general supervise and control all of the business and affairs of the [CCB] and the [board]." (Emphasis added.) On January 23, 1996, the board clearly articulated that the cochairpersons, if acting jointly, could initiate a lawsuit against the defendants: "The [board] gives authority to the CCB Chairpersons to investigate and if necessary initiate legal action . . . ." In other words, the board's authorization effectively invalidated any presumptive authority that the president may have had to initiate legal action on her own accord. Accordingly, even if we were to assume that Maya was the official president of the CCB, her position alone does not confer the inherent authority to bind the CCB.

B

Maya next argues that she had the authority to bring this action to preserve the corporate interest because she and McDuffie, the two officers who were expressly authorized to bring an action, were deadlocked in disagreement. We disagree.

The following additional facts are relevant to this claim. During the evidentiary hearing, the trial court heard testimony that, subsequent to the council's February 5, 1996 resolution, the mayor contacted Maya to request her presence at a meeting to discuss CCB issues.

Maya informed the mayor that she would have to consult with McDuffie before accepting the invitation. When Maya contacted McDuffie, Maya learned that McDuffie had already met with the mayor. Maya later discovered that McDuffie had signed a letter that gave the mayor authority to take the actions that occurred at the February 5, 1996 council meeting. Although McDuffie then denied Maya's request that McDuffie rescind her signature on this letter, Maya explained that legal counsel had informed her that the CCB could initiate a lawsuit to challenge the council's actions on February 5. McDuffie indicated that she would telephone Maya back after contemplating the matter further. When Maya did not receive a timely response from McDuffie, she telephoned McDuffie to express her intent to retain an attorney to initiate a lawsuit on the CCB's behalf. McDuffie apparently did not respond to Maya's statement.

Maya argued that McDuffie's silence represented a deadlock situation. The trial court was unpersuaded. Instead, the trial court found that "[t]he fact that [Maya] contacted . . . McDuffie who did not really respond either affirmatively or negatively to the bringing of the action will not permit the court to infer that she acquiesced in the action. . . . The court will make one other finding that the court is not convinced whether there was ample evidence to indicate that an emergency, urgent, or critical situation existed . . . nor was there a deadlock situation."

We recognize that Maya, as a cochairperson and a director of the board, could initiate an action on behalf of the CCB if deadlock had existed and the need for action to preserve vital corporate interests had been urgent. See *Conlee Construction Co.* v. *Cay Construction Co.*, 221 So. 2d 792, 795 (Fla. App. 1969); cf. *Covington Housing Development Corp.* v. *Covington*, 381 F. Sup. 427, 430 (E.D. Ky. 1974), aff'd, 513 F.2d 630 (6th

Cir.), cert. denied, 423 U.S. 869, 96 S. Ct. 133, 46 L. Ed. 2d 99 (1975). Whether deadlock or a critical situation exists, however, is a question of fact that must be established to show that there is sufficient impasse or stalemate to create an implied authority to institute litigation absent actual authority. See *Sterling Industries, Inc.* v. *Ball Bearing Pen Corp.*, 298 N.Y. 483, 492–93, 84 N.E.2d 790 (1949); 18B Am. Jur. 2d 440, Corporations § 1567 (1985).

"[O]ur role is not to retry the facts. . . . [W]e will upset a factual determination of the trial court only if it is clearly erroneous. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole . . . . We cannot retry the facts or pass on the credibility of the witnesses. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, 239 Conn. 284, 301, 685 A.2d 305 (1996).

On appeal, Maya argues that "[t]he trial court erred in failing to infer that McDuffie's silence created a deadlock with Maya, the two authorized by the corporation to make the decision to initiate a lawsuit on its behalf." We are not persuaded. Because silence, as we have stated in another context, is " 'insolubly ambiguous' "; see *State* v. *Talton*, 197 Conn. 280, 295, 497 A.2d 35 (1985); we must construe such silence narrowly. On the basis of a narrow reading of silence, we cannot conclude that McDuffie's silence during the conversation with Maya regarding the possibility of bringing a lawsuit caused a deadlock situation that warranted Maya's unilateral initiation of this action in contraven-

tion of the January 23, 1996 authorization of the board. In our view, contrary to Maya's assertion, the trial court's determination that no deadlock existed that would have justified Maya's unilateral action was not clearly erroneous.[7]

C

Maya's final claim is that, at a subsequent meeting of the CCB board, the members of the CCB acquiesced in the filing of this lawsuit and thus ratified her action. We disagree.

The following additional facts are relevant to the disposition of this issue. On March 20, 1996, the CCB held its first board meeting subsequent to the initiation of this action. The first order of business at that meeting was a motion to approve the minutes from the previous board meeting, which took place on January 23, 1996. Another board member, Rosa Correa, moved to amend the minutes from the previous meeting because it was her understanding that the motion passed at that meeting empowered the chairpersons to investigate the possibility of legal action, but not to initiate it. The amendment failed, and the board subsequently approved the minutes of January 23, 1996, as written.

During the evidentiary hearing before the trial court, Maya clearly raised and briefed the issue of ratification. Although the trial court did not specifically find that the CCB board had failed to ratify Maya's unilateral action at the March 20, 1996 meeting, such a finding is implicit in the trial court's conclusion that the action should be dismissed for lack of standing. See *24 Leggett*

---

[7] In order for Maya to have had the authority to initiate this action on behalf of the CCB, she needed to demonstrate at trial *both* deadlock and urgency. See *Conlee Construction Co.* v. *Cay Construction Co.*, supra, 221 So. 2d 795. In light of our conclusion that no deadlock existed, we need not address the propriety of the trial court's determination regarding urgency or the dissenting opinion in this respect.

*Street Ltd. Partnership* v. *Beacon Industries, Inc.*, supra, 239 Conn. 300–301 (concluding trial court's implicit factual finding not clearly erroneous); *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 29–30, 662 A.2d 89 (1995) (finding of actual malice was implicit in trial court's decision with respect to defamation); *Rene Dry Wall Co.* v. *Strawberry Hill Associates*, 182 Conn. 568, 575, 438 A.2d 774 (1980) (although trial court did not make explicit finding of reasonableness, such conclusion was implicit in findings and supported by testimony).

As a general rule, "[r]atification is defined as the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account. . . . Ratification requires acceptance of the results of the act with an intent to ratify, and with full knowledge of all the material circumstances." (Citation omitted; internal quotation marks omitted.) *Russell* v. *Dean Witter Reynolds, Inc.*, 200 Conn. 172, 185, 510 A.2d 972 (1986). "In order to ratify the unauthorized act of an agent and make it effectual and obligatory upon the principal, the general rule is that the ratification must be made by the principal with a full and complete knowledge of all the material facts connected with the transaction to which it relates; and this rule applies, of course, to ratification by a corporation of an unauthorized contract or other act by its officers or agents, whether the ratification is by the stockholders or by the directors, or by a subordinate officer having authority to ratify." (Internal quotation marks omitted.) *Cohen* v. *Holloways', Inc.*, supra, 158 Conn. 408.

We recognize that "[a]uthority in the agent of a corporation may be inferred from the conduct of its affairs, or from the knowledge of its directors and their neglect to make objection." *Mahoney* v. *Hartford Investment Corp.*, 82 Conn. 280, 286, 73 A. 766 (1909). Indeed, we have stated that "[s]ilence, as well as affirmative acts,

may imply an intent to ratify." *Hartford Accident & Indemnity Co.* v. *South Windsor Bank & Trust Co.*, 171 Conn. 63, 72, 368 A.2d 76 (1976); see *Young* v. *Data Switch Corp.*, 231 Conn. 95, 102, 646 A.2d 852 (1994); see also 18B Am. Jur. 2d 505, Corporations § 1653 (1985) ("[a] corporation may ratify an unauthorized act of its agent by passive acquiescence as well as by affirmative action"). "The nature and extent of an agent's authority is a question of fact for the trier where the evidence is conflicting or where there are several reasonable inferences which can be drawn." *E. Paul Kovacs & Co.* v. *Alpert*, 180 Conn. 120, 126, 429 A.2d 829 (1980). "Since ratification in a given case depends ultimately upon the intention with which the act or acts, from which ratification is claimed, were done, and since intention is a mental fact and its finding clearly one of fact, the finding in a given case of ratification is one of fact and not reviewable unless the conclusion of ratification, drawn from the facts, is plainly erroneous." *McDermott* v. *McDermott*, 97 Conn. 31, 37, 115 A. 638 (1921).

Maya asserts that, at the time of the March 20, 1996 meeting, the CCB members had full knowledge of the pending action, and their failure to repudiate her actions constituted ratification. We disagree. The only question raised at that meeting with respect to the pending litigation was whether to amend the minutes of the previous meeting or to approve them as written. The board ultimately approved the minutes of the previous meeting, at which the board authorized the cochairpersons to investigate or, if necessary, to initiate litigation, provided that the cochairpersons act jointly. "An accurate copy of the minutes is important, since a corporation is deemed to speak officially only through its records, which includes the minutes. The minutes are generally prima facie evidence of the facts stated therein . . . ." 3 Z. Cavitch, Business Organizations (1997) § 62.05 [2]. The minutes that the board approved were the same

minutes on which the trial court relied in determining that Maya had acted without authority. Indeed, the fact that the board approved the minutes of the previous meeting reflects an intent not to ratify Maya's unilateral action, but, instead, to reaffirm the board's authorization contained in the minutes that the cochairpersons had to act in unison to initiate legal action. Because ratification is a question of fact, and the trial court implicitly found that there was no ratification in this case, we conclude that the trial court's conclusion was not clearly erroneous.[8]

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and PALMER and MCDONALD, Js., concurred.

BERDON, J., dissenting. The sole issue before this court is whether this action, brought in the name of

---

[8] The dissent makes much of the fact that, at the March 20 meeting, the board defeated a motion to correct the minutes of the January 23 meeting that would have rescinded authority to institute this action. The dissent's argument, however, depends upon a finding by the trial court that the board *intended* to ratify this action. Intention is "[a]n essential element in the doctrine of ratification . . . ." *Gallon* v. *Lloyd-Thomas Co.*, 264 F.2d 821, 826 (8th Cir. 1959). Although intent may be inferred from unexplained silence; *Hartford Accident & Indemnity Co.* v. *South Windsor Bank & Trust Co.*, supra, 171 Conn. 72; the trial court never found that the board intended to ratify this action. "While it is the duty of the judge who tried the case to set forth the basis of that decision; *Powers* v. *Powers*, 183 Conn. 124, 125, 438 A.2d 845 (1981); if the . . . appellant . . . claims that the court's memorandum of decision lacks a sufficient factual basis or is unclear or incorrect, it is that party's burden to have corrected or perfected that record." *Gerber & Hurley, Inc.* v. *CCC Corp.*, 36 Conn. App. 539, 543, 651 A.2d 1302 (1995).

Furthermore, the board's vote defeating the motion to correct the minutes of the January 23 meeting was entirely consistent with the trial court's order that the status quo be maintained during the pendency of this action. Finally, contrary to the dissent's argument, the board's adoption of the January 23 minutes can hardly constitute implied ratification of the present action because the vote accepted the minutes only as an accurate statement of what had transpired at the January 23 meeting. See S. Cross, supra, (Sup. 1990) § 5.3 (C), p. 243.

the plaintiff, Community Collaborative of Bridgeport, Inc. (CCB), against the defendants, Joseph P. Ganim, mayor of the city of Bridgeport (mayor), and the city council of the city of Bridgeport (city council), was authorized. The merits of the underlying complaint are not relevant to the issue before us, other than that this action was brought to preserve vital corporate interests, a fact the majority does not dispute. The court affirms the trial court's dismissal of this action on the ground that Alma Maya, the president and cochairperson of the CCB, did not have the authority to institute the action on behalf of the CCB. In doing so, the majority stands corporate law on its head in at least two respects. First, Maya and her cochairperson, Mary McDuffie, were authorized by the CCB to bring such an action and, because the two chairpersons were deadlocked, Maya was authorized to bring it on her own authority. Second, even if Maya was not authorized to initiate this litigation, the board of directors of the CCB (board) ratified Maya's actions.

I

Maya and her cochairperson, McDuffie, were authorized by the board, at its January 23, 1996 meeting, "to investigate and if necessary initiate legal action, including retention of legal counsel, on behalf of the Board to prevent a City of Bridgeport takeover of the federal Enterprise Community funds and process." Although Maya, on her own, initiated this action for that purpose on behalf of the CCB, the law is clear that she had the authority to do so in order to protect vital corporate interests. The majority concedes "that Maya, as a cochairperson and a director of the board, could initiate an action on behalf of the CCB if deadlock had existed and the need for action to preserve vital corporate interests had been urgent." See *Conlee Construction Co.* v. *Cay Construction Co.*, 221 So. 2d 792, 795 (Fla. App. 1969); cf. *Covington Housing Development Corp.* v.

*Covington*, 381 F. Sup. 427, 430 (E.D. Ky. 1974), aff'd, 513 F.2d 630 (6th Cir), cert. denied, 423 U.S. 869, 96 S. Ct. 133, 46 L. Ed. 2d 99 (1975). The trial court found that there was no deadlock between Maya and McDuffie and that there was no urgency. Although I agree with the majority that we will not upset factual findings of the trial court unless they are clearly erroneous, the undisputed facts in this case do not support the trial court's findings.

I would find that there was a deadlock for two reasons. First, the fact that McDuffie signed a letter that gave the mayor and the city council carte blanche to take the actions passed in the city council's resolution of February 5, 1996, which would enable the city of Bridgeport to diminish the CCB's role in formulating its own budget—the subject matter of this litigation—points to the irrefutable conclusion that McDuffie and Maya were deadlocked. This is buttressed by the fact that Maya requested McDuffie to rescind her acquiescence in the mayor's fiscal plans for the CCB, but McDuffie refused to do so. Second, it is undisputed that Maya then sought McDuffie's approval to initiate this litigation, but McDuffie refused to respond. McDuffie's refusal to rescind her signature on the letter and her subsequent silence constituted an outright disagreement with Maya over whether to initiate litigation.

As far as the need to preserve vital corporate interests is concerned, the urgency is clear because the city council's resolution would alter the composition of the board and would diminish the board's role in formulating its budget. It is clear that the mayor and the city council were attempting to wrestle away substantial fiscal control from the board.

I would hold that there was a deadlock, that vital corporate interests were at stake and that, based on the

circumstances in this case, the trial court's conclusions were clearly erroneous.

## II

Notwithstanding that Maya had the authority to institute the litigation, the board implicitly ratified the bringing of this action. This court has held that "[i]f the officers or the agents of a corporation assume to act for the corporation without any authority at all, or if they exceed their authority or act irregularly, and the act is one *which could have been authorized in the first instance* by the stockholders, board of directors or subordinate officers, as the case may be, it may be expressly or impliedly ratified by them, and thus be rendered just as binding, except as to intervening rights of third persons, as if it had been authorized when done, or done regularly." (Emphasis added; internal quotation marks omitted.) *Cohen* v. *Holloways', Inc.*, 158 Conn. 395, 407–408, 260 A.2d 573 (1969). Stated another way, and as applied to this case, if a corporation, *with knowledge of the facts*, does not repudiate litigation brought on its behalf, it thereby impliedly ratifies the action of its officer in bringing the litigation. Id., 409; see also *Russell* v. *Dean Witter Reynolds, Inc.*, 200 Conn. 172, 185, 510 A.2d 972 (1986).

After this action was instituted and the defendants had filed their motion to dismiss, and after the trial court had commenced hearings on the motion, the board impliedly ratified the bringing of this action at its meeting of March 20, 1996. Maya presided over that meeting. The following excerpts from the minutes of the March 20 meeting reveals that the board was cognizant of the CCB's pending litigation with the mayor and the city council.

The city attorney, whose office was representing the defendants in this case, had the audacity to attend the March 20 meeting in order to attempt to undermine

Maya's authority to bring this action on behalf of the CCB. In an attempt to adjourn the March 20 meeting before the board could discuss the litigation, the city attorney sought to appeal Maya's ruling that there was a quorum. That appeal failed.

After a motion was made to approve the minutes of the January 23 board meeting, Rosa Correa, a director of the board, questioned whether authority was granted to the chairpersons of the CCB, which included Maya, to institute this litigation. Although Correa failed formally to move to correct the minutes of the January 23 meeting, the city attorney stated "that unless Correa's statement is treated as a motion to correct, then [the city attorney] was making a motion to correct."

Thereafter, the minutes of the March 20 meeting reflect the following discussion: "Christopher Caruso [a director of the board] then made a point of order. He queried whether it was [the city attorney] or [Dennis Murphy, another director of the board] who was representing the city at this meeting. If Murphy was, then he should be raising these points. Caruso added that [the city attorney] is also counsel for the City of Bridgeport. *It was very important for the record to reflect that the City Attorney's office is involved in litigation with the [CCB] in court.* [Caruso] asked who was representing the city. Upon further inquiry by Maya, Murphy responded that he was representing the City at this meeting." (Emphasis added.)

Correa's objection to the approval of the January 23 minutes was then considered to be a motion to amend the minutes by deleting the authority to institute "legal action from the January 23, 1996 minutes." The motion was seconded, but was defeated in a roll call vote (14 in favor, 18 against and 2 abstentions). The board then approved the January 23 minutes.

Thereafter, Murphy, the representative on the board from the city of Bridgeport, stated "that the vote to approve the minutes was not in keeping with [the trial court's previous] order to maintain the status quo." A motion to adjourn the meeting was then made and, on a roll call vote, the meeting was adjourned.

The board, at its March 20 meeting, not only defeated a motion to correct the minutes of the January 23 meeting that would have rescinded the authority to institute this action, but, also, with *full knowledge* that Maya instituted this litigation, impliedly ratified the bringing of this action.[1]

The majority colors this case with the underlying substance of the dispute—that is, an adoption of a budget by the CCB that, according to the defendants, authorized excessive amounts for the administration of the CCB. But that issue is not before this court and should not be dispositive of this appeal.

In my view, Maya, as a cochairperson of the CCB, had the authority to initiate this action because of the deadlock situation that existed with her cochairperson, McDuffie, and because of the vital corporate interests

---

[1] The majority, in response to this dissent, asserts that the ratification I depend upon was the adoption of the motion to approve the minutes of the January 23 meeting. That simply misconstrues this dissent. I rely on the March 20 meeting because the board had full knowledge of the litigation and impliedly ratified it by taking no action to disaffirm the initiation of the litigation. In a case relied upon by the majority, with respect to the law of ratification, this court adopted the rule set forth in the Restatement (Second) as follows: "We have frequently held that: Ratification is defined as the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account. Restatement (Second), 1 Agency § 82 (1958)." (Internal quotation marks omitted.) *Russell* v. *Dean Witter Reynolds, Inc.*, supra, 200 Conn. 185. Implied ratification is "sometimes put upon the ground that ratification of the unauthorized act is *presumed* from failure to *disaffirm*." (Emphasis added; internal quotation marks omitted.) *Cohen* v. *Holloways', Inc.*, supra, 158 Conn. 408. Thus, based on the undisputed facts of this case, and contrary to the majority's conclusion, ratification is presumed.

at stake. Even if Maya did not have the authority, however, her action was impliedly ratified by the board. Moreover, the conduct of the defendants in this case through the city attorney, with respect to the March 20 meeting, requires this court to reverse the dismissal by the trial court and to remand the matter for further proceedings.

Accordingly, I dissent.